UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
TRANSFIELD ER CAPE LTD.

                             Plaintiff,

-v-

TMT BULK CO., LIMITED

                            Defendant.
-------------------------------------------------------------------x

*JUDGE STEIN*

09 CV 6082 (SHS)

09 CV 6082

**VERIFIED COMPLAINT**

JUL 06 2009

U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff, TRANSFIELD ER CAPE LTD., (hereinafter "TRANSFIELD") by its

attorneys, CHALOS & CO, P.C., as and for their Verified Complaint against Defendant, TMT

BULK CO., LIMITED (hereinafter referred to as "TMT"), alleges upon information and

belief as follows:

### JURISDICTION

      1.      The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure and within the admiralty and maritime jurisdiction of this Court

under 28 U.S.C. § 1333.

### THE PARTIES

      2.      At all times material hereto, Plaintiff, TRANSFIELD, was, and still is, a

foreign business entity, organized pursuant to the laws of the British Virgin Islands.

      3.      At all times material hereto, Defendant, TMT, was and still is a foreign

business entity, with a principal place of business in Taipei City, Taiwan.

## FACTS AND CLAIM

4.      On or about January 26, 2007, Defendant, TMT as owners and Plaintiff TRANSFIELD as charterers entered into a charter party agreement and contract of affreightment ("COA") for twelve (12) firm shipments of iron ore.  *See charter party agreement attached hereto as Exhibit 1.*

5.      This charter party agreement is a maritime contract.

6.      Specifically, the agreement called for the carriage of iron ore in bulk, with twelve (12) cargoes evenly spread between May 1, 2007 and April 30, 2010.

7.      Defendant, TMT, has failed to honor its contractual obligations under the agreement, by failing to perform the ninth (9th) lifting pursuant to the terms and conditions of the charter party.

8.      As a result of TMT's failure to act in accordance with its obligations under the charter party agreement, TRANSFIELD has incurred losses estimated in the amount of USD $3,183,840.00[1] for the cargo under the agreement.

9.      TMT, in breach of the terms of the agreement, has failed, neglected and/or otherwise refused to pay plaintiff for losses suffered as a result of TMT's breach of the agreement.  The principal damages due and owing to Plaintiff, TRANSFIELD by Defendant, TMT is in the amount of USD $3,183,840.00.

10.     Pursuant to the terms of the charter party agreement and COA, all disputes arising there under are to be submitted to London arbitration with English law to apply. Plaintiff will commence arbitration after the commencement of this action and jurisdiction is obtained over Defendant.

---

[1] US $18.09 (Freight Difference) x 176,000 MT (Cargo Quantity) = US $3,183,840.00

11.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

12.     English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

13.     As best as can now be estimated, the Plaintiff TRANSFIELD expects to recover the following amounts in London arbitration from Defendant:

| | | |
|---|---|---|
| A. | Principal claim: | $3,183,840.00 |
| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | $ 795,056,99 |
| C. | Estimated attorneys' fees: | $100,000.00 |
| D. | Estimated Arbitration cost: | $100,000.00 |
| | **Total Claim:** | **$4,178,896.99** |

14.     Therefore, TRANSFIELD's total claim for breach of the maritime contract against Defendant is in the aggregate USD $ 4,178,896.99.


BASIS FOR ATTACHMENT

15.     Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including but not limited to electronic fund transfers.

16.    Defendant is continuously engaged in international shipping and conduct business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City. Dollars are the *lingua franca* of international commerce.

17.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

18.    Plaintiff believes that some of these assets, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the Defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendant and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank, Wells Fargo Bank, CHIPS and possibly other banks or financial institutions located in New York.


WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.      That since the Defendant cannot be found within the District, as set forth in the

Declaration of George M. Chalos (*attached hereto as Exhibit 2*), and pursuant to Rule B and

Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue

an Order directing the Clerk of Court to issue Process of Maritime Attachment and

Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty

and Maritime Claims, attaching all of the Defendant's tangible or intangible property or any

other funds held by any garnishees in the district which are due and owing, or other property

of, or for the benefit of, the Defendant, up to the amount of USD $4,178,896.99 to secure and

satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to

appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters

alleged in the Complaint;

C.      That Plaintiff may have such other, further and different relief as may be just

and proper.

Dated: Oyster Bay, New York
       July 6, 2009

                                        CHALOS & CO, P.C.
                                        Attorneys for Plaintiff
                                        TRANSFIELD ER CAPE LTD.


                        By:     _____
                                George M. Chalos (GC-8693)
                                123 South Street
                                Oyster Bay, New York 11771
                                Tel: (516) 714-4300
                                Fax: (516) 750-9051
                                Email: gmc@chaloslaw.com

EXHIBIT 1

1ST ORIGINAL

# CHARTER PARTY
## Dated 26th January, 2007

| | |
|---|---|
| Owners | :TMT BULK CO., LIMITED |
| Charterers | :TRANSFIELD ER CAPE LTD. BRITISH VIRGIN ISLANDS |
| Performing Vessel | :M.V. "TMT TBN" |
| Loading Port | :Ponta Da Madeira or Tubarao or Sepetiba or GIT or UBU, Brazil |
| Discharging Port | :Options in China |

!ST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

This Charter Party, dated 26th January, 2007 is concluded by and between Transfield ER Cape Limited., British Virgin Islands as Charterers (hereinafter referred to as 'Charterers') and TMT BULK COMPANY LIMITED as Owners (hereinafter referred to as 'Owners').

## WITNESSETH THAT:

This is a Charter Party with Owners for twelve film shipment of IRON ORE from one-two safe berth(s), one safe port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba (which to be renamed as itaguai), or in Charterers' option one-two safe berth, one safe port GIT, or in Charterers option one-two safe berth(s), one safe port UBU

to

one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang, or in Charterers' option one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao and one or two safe berth(s) each one safe port Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one safe anchorage and one-two safe berth(s) each Shanghai (Luhuashan and Luojing, which to be deemed as one discharging port) or Zhanjiang or Fangcheng, or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashang and Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao plus Lanshan, or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal).

WHEREAS, Charterers undertake to provide and Owners undertake to transport on the terms and conditions are set forth as follows.

1.    Definitions

In this Charter Party, unless otherwise defined, the terms should have following meanings:

1.A.  'Ore' means iron ore in bulk including iron ore concentrates in bulk, and fine, pellets, lump in bulk. Their quality, nature and shipping conditions are within IMO regulation, but always excluding DRI/DRIP/HBI and Sponge Iron Ore.

1.B.  'Dollars' and 'Cents' - means respectively dollars and cents in lawful money of the United States of America.

1.C.  "Charter Party cargo" - means cargo of IRON ORE from one-two safe berth(s), one safe port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba (which to be renamed as itaguai), or in Charterers' option one-two safe berth, one safe port GIT, or in Charterers option one-two safe berth(s), one safe port UBU to one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang, or in Charterers'

1ST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

option one or two safe berth(s) one safe port Beilun or Majishan or Qingdao or Rizhao plus one or two safe berth(s) each one safe port Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one safe anchorage and one-two safe berth(s) each Shanghai (Luhuashan+Luojing, which to be deemed as one discharging port) or Zhanjiang or Fangcheng, or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashan plus Nantong or Zhangjiagang (Haili Terminal), or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao plus Lanshan, or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or Zhangjiagang (Haili Terminal),

1.D. "Business Day" – means days excluding Saturdays, Sundays, public holidays and bank holidays in China.

## 2. Vessels To Be Nominated

TMT Bulk Company Limited – MAXIMUM 18 YEARS.

Owners confirm performing vessel will be either Owners' period in vessel or time Charter-in vessel or voyage Charter-in vessel. And Owners confirm that each vessel nominated will be under Owners' control and the period will be longer than each shipment.

The operating vessel should be Owners controlled or Chartered bulk carriers or ore carriers, or OBO or ore-oil combination carriers, seaworthy, cargo worthy, tight, staunch, and strong suitable for intended voyage and suitable for ordinary grab discharging and shall be in the highest classification for vessels of their age and type with Lloyds, ABS or equivalent. All certificates of the nominated vessel shall be valid till the relevant voyage is complete.

Owners guarantee the vessel is fitted for Iron Ore trade between Brazil and China and comply with all loading and discharging ports regulations and having all valid certificates, etc. All time/costs/expenses incurred in not complying with the regulations to be for Owners' time and account. In case any survey at loading port causing by vessel's age and condition, Notice of Readiness will only be allowed to tender after such survey granted.

## 3. Shipping Period / Nomination

(1)  one cargo every three months commencing from 1st May, 2007 to 30th April, 2010 fairly even spread.

(2)  latest 35 days before 1st Layday, Charterers to declare the Laycan of 10 days spread. Owners to nominate the intended performing vessel latest 25 days before the 1st layday. Owners option to substitute with final performing vessel latest 15 days before 1st layday. all nominations are subject to shipper/receiver approval within 2 working days after receiving the nomination within Chinese business hours.

## 4. Cargo Quantity

Total 12 firm shipments, which shall be fairly evenly spread.

Each cargo size 160,000 wet metric ton 10 percent more or less in owners' option of iron ore in bulk including iron ore concentrates in bulk, fine, pellets and lump but always

3

IST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

excluded direct reduced iron ore, direct reduced iron ore pellets, hot briquetted iron ore, hot briquetted iron ore pellets and any other of DRI/HBI products, direct reduction iron ore. Maximum two grades are allowed and cargo shall be loaded, stowed, trimmed, carried and discharged in accordance with IMO's and local requirements and recommendations.

5.    Deviation

Carrying vessel shall sail and arrive at the port of discharging within the normal and reasonable period of time. Any unreasonable deviation or delay is not allowed. It is understood that the vessels are allowed to proceed at economical speed and bunker on usual route.

Owners shall have the responsibility to advise Charterers of accidents occurred as soon as which is known to Owners while vessel being en route. If Owners fail to give such advice in time, any losses and charges incurred therefrom shall be for Owners' account. For the purpose of saving life or property the vessel has liberty to sail with or without pilots to tow and assist vessel in distress and to deviate.

6.    Notices

6.A.    On sailing from the proceeding port, Master and Owner shall inform the Shippers and Shipper's Port Administration at Port of Loading and Charterers, by telex or fax, the expected time of arrival (ETA) of the vessel. Such information shall be updated twelve (12) days, eight (8) days three (3) days, two (2) days and one (1) day before the vessel's expected arrival at loading port, or at any time upon Charterers' request.

6.B.    Master or Owners shall with the 72 hours notice inform Shippers about vessel's cargo plan with following details:
-    Arrival and departure drafts
-    Air draft
-    Ballast quantity on arrival and, if in cargo holds, how distributed
-    Time required for deballasting after berthing (deballasting time will be accorded to condition when vessel passed nomination by Charterers.)
-    Loading sequence

Master or Owners shall also state in 72 hours notices, whether a 'Gas Free Certificate' is required or not.

Unless otherwise instructed by Shippers, Master or Owners shall undertake that vessel be presented for berthing with minimum ballast compatible with vessel's seaworthiness.

6.C.    Owners should, on departure of each vessel from the loading port, by cable (including e-mail or fax) inform Charterers of the shipping advice (indicating departure date, ETA China, loaded quantity of each type of ore, estimated arrival draft and hatchwise plan).

6.D.    Master of the vessel or Owners shall give Charterers' agents and Charterers at the discharging port(s) the following 6 notices of ETA of the vessel at the discharging port. The first notice to be given on departure of the vessel loading port, then 20 days, 15 days, 10 days, 72 hours and 24 hours prior to ETA.

The first notice shall indicate the name of the vessel, the type and quantity of cargo and the number of compartments.

4

1ST ORIGINAL

*MV "TMT TBN"*
*DATED 26ᵀᴴ JANUARY, 2007*

7.      Loading Port and Discharging Port

7. A. a.  Charterers shall load the cargo and trimmed at one-two safe berth(s), one safe
port Ponta da Madeira, or in Charterers' option one-two safe berth, one safe port
Tubarao, or in Charterers' option one-two safe berth, one safe port Sepetiba
(which to be renamed as Itaguai), or in Charterers' option one-two safe berth,
one safe port GIT, or in Charterers option one-two safe berth(s), one safe port
UBU, Brazil (for Sepetiba need two freight for 17.1m draft and 18.1 draft
respectively), always safely afloat, free of risks, expenses to Owners.

7. A. b.  Upon completion of loading, the vessel shall proceed to

one or two safe berth(s) each one safe port Beilun or Majishan or Qingdao or
Rizhao or Yantai or Caofeidian or Bayuquan or Dalian or Xingang or Lianyungang,

or in Charterers' option one or two safe berth(s) one safe port Beilun or Majishan
or Qingdao or Rizhao plus one or two safe berth(s) each one safe port Baoshan or
Luojing or Nantong or Zhangjiagang (Haili Terminal),

or in Charterers' option one safe anchorage and one-two safe berth(s) each
Shanghai (Luhuashan+Luojing, which to be deemed as one discharging port) or
Zhanjiang or Fangcheng,

or in Charterers' option one safe anchorage and one-two safe berth(s) Luhuashan
plus Nantong or Zhangjiagang (Haili Terminal),

or in Charterers' option one-two safe berth(s) each one-two safe port(s) Rizhao
plus Lanshan,

or in Charterers' option one safe anchorage and one-two safe berth(s) Zhanjiang
or Fangcheng plus one-two safe berth(s) each Baoshan or Luojing or Nantong or
Zhangjiagang (Haili Terminal),

always be accessible and safely afloat, free of risks, expenses to Owners.

8.      Demurrage and Despatch Clause

Demurrage and despatch shall be calculated on the basis of the statement of facts made
by Agents at loading port entrusted by Owners and mutually confirmed by Master and
Loading or Discharging Port Authority.

Laytime is non-reversible between loading port and discharging port(s)

8.A.    Loading Port

Laytime at the loading port is non-reversible.

Loading rate as per scale terms:

At Tubarao / Ponta da Madeira: 40 hours for 1st 120,000 wet metric tons and 1 hour or
pro-rata for each 5,000 wet metric tons exceeding 120,000 metric tons turn time 12 hours
unless sooner commenced actual time used to count

IST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

At GIT: 55,000 metric tons per weather working day Sunday and Holiday included with 12hrs turn time unless sooner commenced actual time used to count

At Sepetiba: 50,000 metric tons per weather working day Sunday and Holiday included with 12 hours turn time unless sooner commenced actual time used to count

At Ubu: 60,000 metric tons per weather working day Sunday and Holiday included with 12 hours turn time unless sooner commenced actual time used to count

Demurrage rate: US$55, 000 per day or pro rata for part of a day for laytime saved.

Despatch rate: US$27, 500 per day or pro rata for part of a day for laytime saved both ends.

8 A. a.    The following time will not count as laytime at loading ports:-

- Time used for sailing from anchorage to wharf till all fastened at the designated loading berth

- Time used for joint inspection

- Time used for draft survey during loading

- Stoppage caused by adjusting ballast (or deballasting)

- Stoppage caused by bad weather (bad whether will be defined according to the declaration of terminal/port authority)

- Stoppage or partial stoppage caused by Owners and partial stoppage as pro rata

- Stoppage caused by Force Majeure

8.B.    Discharging Ports

Discharging rate: 25,000 metric ton per weather working day Sunday and Holiday included with turn time 24 hours each discharging port unless sooner commenced half time to count.

Demurrage rate: US$55, 000 per day or pro rata for part of a day for laytime saved.

Dispatch rate: US$27, 500 per day or pro rata for part of a day for laytime saved both ends.

8. B. a.    At the discharging ports, Notice of readiness shall be tendered any time day and night Sundays and holidays included, provided the vessel is ready for discharging. Laytime shall commence 24 hours after tendering the Notice of Readiness, unless sooner commenced.

8. B. b.    The following time will not count as laytime at discharging ports:
- Time used for sailing from anchorage to wharf till all fastened at the designated discharging berth
- Time used for shifting between berth to berth
- Time used for draft survey during discharging
- Stoppage caused by adjusting ballast (or deballasting)
- Stoppage caused by bad weather (bad whether will be defined according to the declaration of terminal/port authority)
- Stoppage or partial stoppage caused by Owners and partial stoppage as pro rata.
- Stoppage caused by Force Majeure

8. B. c.    Deleted.

8. B. d.    Deleted.

IST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

8. B. e.    Each vessel has the right, according to the rules and regulations of the port, to sail from discharging port at the first available tide (confirmed by pilot station of the port) after completion of discharging, no matter laytime has been fully used or not.

8. B. f.    The Master has will try to persuade the Port Authority at discharging port to clean the remains of cargoes dropped on deck during discharging. Expense shall not be for Owners' account.

## 9.    Freight Rates

Tubarao/Qingdao:        USD 27.70 per metric ton F.I.O.S.T. basis 1/1

Freight for other loading and discharging ports to be calculated on the open book basis based on the time charter return by the final performing vessel on Tubarao/Qingdao route at agreed base freight rate to the final discharging port only and no re-positioning advantage/dis-advantage for owners.

Terms for other loading and discharging ports to be advised later. Any alternative load port shall be always within Brazil and any alternative discharging port shall be always within People's Republic of China.

The above freight rate shall be on F.I.O.S.T. basis per metric tons on Bills of Lading quantity (and deadfreight if applicable).

## 10.    Payment of Freight

10.A.    Freight is to be paid in U.S. Dollars to the bank account designated by Owners.

10.B.    95% of freight payable within 7 banking days after signing/releasing Bills of Lading marked 'freight payable as per c/p' and against owners' original freight invoice. Balance including demurrage(s)/ dispatch(es), if any, to be settled within 30 calendar days after completing discharging and agreeing laytime calculation with support documents.

## 11.    At Discharging Ports

11.A.    The Cargo on vessel shall be in grabs' reach. Vessel shall be guaranteed suitable for grab discharge. If the cargo is not accessible by means of grabs (including in hatches), the extra expenses over and above the cost of normal grab discharge at discharging ports shall be for Owners' account.

11.B.    Overtime of the crews and officers on board shall be for Owners' account. The vessel shall, if required, supply light for night work as on board free of expenses to Charterers.

## 12.    Taxes and Dues

Any taxes/dues/wharfages on cargo at loading and discharging ports shall be for Charterers' account. Any taxes/dues/wharfages on vessel/freight/Bill of Lading at loading port shall be for Owners' account.

1ST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

13.   Stevedoring Damage at Loading and Discharging Ports

Stevedoring damage, if any at loading port shall be settled between Port Authorities and Owners, but Charterers will lend all possible assistance to Owners.

Stevedoring damage, if any at discharging port, shall be settled between Owners and Port Authorities, but Charterers will lend all possible assistance to Owners in collecting any stevedore damage claims.

14.   Bill of Lading

The Bill of Lading shall be prepared in accordance with procedures established in the Purchase Charter Party. The Bill of Lading shall be signed by Master or Agents of Owners within 24 hours after completion of loading and awarded to Shippers, freight and all conditions as per this Charter Party. If any of clauses in Bill of Lading is inconsistent with that in this Charter Party, the latter to be taken as governing documents.

15.   Assignment

Neither Owners or Charterers may assign the Charter Party in whole or in part without prior written consent of the other party. Owners and Charterers shall always remain responsible for the due fulfillment of this Charter Party.

16.   Agent(s)

Charterers' agents at both loading and discharging port. Agents to be local licensed shipping agency to be nominated which is subject to Owners approval.

Port disbursement: a lumpsum USD 90,000 for port disbursement at one discharging port and USD 120,000 for port disbursements at two discharging ports which will be deducted from initial freight payment without supporting voucher.

Once the agents have been confirmed, Charterers/Owners shall inform Charterers/Owners of their agents at loading and discharging ports in time. Charterers/Owners shall send to Charterers/Owners by express-mail or fax the statement of facts of loading and discharging ports within three (3) business days after the completion discharging.

17.   General Average

In case of General Average, the same shall be adjusted according to 'YORK-ANTWERP Rules, 1974 amended 1990'. Should the vessel be put into any port or ports due to leakage or damage incurred en route or in any port, the Master and Owners shall inform Charterers without any delay.

18.   War Cancellation Clause

In the event of war or warlike operation involving either Japan, the United States of America, Great Britain, Russia, P.R. China, Brazil, Norway or the nation under the flag of which any vessel performing under this Charter Party is registered, and this, seriously affects Charterers' or Owners' ability to perform or cost of performing their obligations

1ST ORIGINAL

*MV "TMT TBN"*
*DATED 26ᵀᴴ JANUARY, 2007*

under this Charter Party, Charterers or Owners may advise the other party, that they wish to cancel this particular voyage.

The parties shall then meet within thirty (30) days, to decide whether this Charter Party or any part of it shall be amended, suspended or otherwise dealt with. If no agreement is reached, the Charter Party shall be suspended for ninety (90) days and failing agreement by end of this ninety (90) days extension, the voyage in question shall be canceled. If major war breaks out between any two or more of the above-mentioned countries directly affecting the performing of this Charter Party, both Owners and Charterers shall have the right to cancel this Charter Party.

19.    **Both to Blame Collision Clause**

Clause 23 of ASBATIME 1981 apply to this Charter Party.

20.    **New Jason Clause**

Clause 23 of ASBATIME 1981 apply to this Charter Party.

21.    **Clause Paramount**

All Bills of Lading under the Charter Party shall include the following Clause Paramount:

Hague-Visby Rules 1968 or similar legislation of the nation of destination shall be applicable.

22.    **War Risk**

Clause 16 of Gencon (Revision 1976) shall apply to this Charter Party.

23.    **Strike and Force Majeure Clause**

23.A.    At loading port

The time lost as a result of all or any of the following causes shall not count as laytime and demurrage VIZ.: wars, rebellions, tumults, civil commotions, strikes, insurrections, political disturbances, epidemics and quarantine, riots, lock-out, stoppage of miners, workmen, railway employees, stevedores, seamen or any other workers essential to the working, carriage, delivery, shipment, interruptions of railway transport, whether partial or general, landslips, floods, intervention of sanitary, customs and/or other constituted authorities or other causes beyond Charterers' control preventing cargo preparation, loading or berthing vessel. Once a nominated vessel has been confirmed by Charterers, any loss of vessels schedule incurred by strikes of the miners or company employees is to be considered as Force Majeure.

23.B    At discharging ports

Time lost as a result of all or any of the following causes shall not count as laytime and demurrage, VIZ: war, rebellions, tumults, civil commotions, strikes, insurrections, political disturbances, epidemics, quarantine, riots, lock-out, stoppage of workmen, railway employees, stevedores, seamen or any other workers essential to the working, carriage, delivery, shipment, interruptions of railway transport, whether partial or general,

ıST ORIGINAL

*MV "TMT TBN"*
*DATED 26ᵀᴴ JANUARY, 2007*

landslips, flood, intervention of sanitary, customs and/or other constituted authorities or other causes beyond Charterers' control preventing cargo preparation, discharging or berthing vessel.

If there is a strike or lockout or boycott or Force Majeure condition, affecting the vessel's arrival time, the discharging after the vessel's arrival at or off the port of discharge, vessel's berthing, departure and same has not been settled within 48 hours, Charterers shall have the option of keeping the vessel waiting until such strike or lockout or boycott or Force Majeure condition is at an end against paying demurrage plus bunkers consumed after expiration of the time allowed for discharge, or ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lockout or boycott or Force Majeure.

Such orders shall be given within 48 hours after the Master or Owners have given notice to Charterers of strike or lockout, boycott or Force Majeure condition affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party shall apply and the vessel shall receive the same freight as if she had discharged the cargo at the original port. If the distance of the substituted port exceeds 100 nautical miles, the freight rate on the cargo delivered at the substituted port to be increased in proportion. In any event any expenses and risk causes by strike or lockout or boycott of Master, officers or crews on board the performing vessel always to be for Owners' account.

24.  **Arbitration**

Any disputes arising under the Charter Party shall be settled amicably. In case no such settlement can be reached, the matter in dispute shall be referred to three persons at LONDON and according to English law. One chosen by each of the parties hereto and the third by the two so chosen; their decision or that of two of them shall be final, and for the purpose of enforcing and award, this agreement may be made a rule of the court, the arbitrators shall be commercial men.

25.  **War Risk Insurance**

War Risk Insurance, if any, shall be for Owners' account.

26.  **Extra Insurance**

No overage premium to apply.

27.  **Lien**

Owners shall have a lien on cargo for ocean freight, deadfreight, demurrage and General Average contribution due under the Charter Party.

28.  **Gas Free Clause**

Vessel nominated by Owners shall be in gas free condition and shall have a valid Gas Free Certificate on board if required by Shippers prior to presentation at loading port. Owners undertake to submit the vessel to a further gas free inspection by a local independent surveyor at loading port for their own account. Notice of Readiness may be tendered prior to such inspection but if the vessel is found not to be gas free, then laytime not to commence until vessel has obtain Gas Free Certificate. If the vessel has already been

10

IST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

berthed at the terminal and then is found not to be gas free by the local surveyor, then the vessel is to vacate the berth immediately and proceed to a safe anchorage for cleaning, all extra expenses for shifting to be for owners' account. Laytime at loading port not to commence to count until the vessel has passed gas free by the local independent surveyor, even if after the expiry of the turn time. In order to expedite such inspection, Master of combination vessel are recommended to inform the loading port agents 48 hours prior to arrival that a surveyor is required on vessels arrival at or off the terminal.

29.    Language / Communication

It is agreed that the English language will be used in notices letter, Cables and all other means of communications. All relevant communications between Charterers and Owners shall be made through telex, telegram or Fax.

30.    LOI

If the Original Bills of Lading cannot be presented at discharging port, Owners/Master agree to discharge/release the entire cargo without presentation of the Original Bills of Lading only against Charterers letter of indemnity on their letter-head, with their authorized signature in Owners standard P and I form and without bank guarantee or bank endorsement.

Discharge ports shown on the Bills of Lading do not constitute a declaration of discharging port and Charterers have the right to order the vessel to other ports within the terms of this Charter Party against Charterers LOI in Owners' P and I format without bank guarantee/endorsement.

31.    ISM Clause

During the currency of this Charter Party, Owners shall procure that the vessel and "The Company" (as defined by ISM Code) shall comply with the requirement of the ISM Code upon request. The Owners shall provide copy of relevant Documents of Compliance (DOC) and Safety Management Certificates (SMC) to Charterers with vessel nomination. Any loss, damage expenses and delay caused by failure or part of Owners or "The Company" to comply with the ISM Code shall be for Owners' account.

32.    Commission

3.75% address commission payable to Charterers on freight, deadfreight and demurrage, and 1.00% brokerage commission payable to CLARKSON ASIA LTD., on freight, deadfreight and demurrage.

33.    Headings

The headings in the Charter Party are for purpose of convenience only and shall not limit or otherwise affect any of the terms or stipulation hereof.

1ST ORIGINAL

*MV "TMT TBN"*
*DATED 26TH JANUARY, 2007*

The Charter Party is written in English and signed as performing Charter Party.

IN WITNESS WHEREOF, this Charter Party has been executed by and between Owners and Charterers in Two (2) originals, one of each to be retained by Owners and Charterers.

CHARTERERS:                              OWNERS:

EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
TRANSFIELD ER CAPE LTD.

|  | Plaintiff, | 09 CV |
| --- | --- | --- |

-v-

**ATTORNEY'S DECLARATION
THAT DEFENDANT
CANNOT BE FOUND
WITHIN THE DISTRICT**

TMT BULK CO., LIMITED

                                Defendant.
------------------------------------------------------------------x

This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

TRANSFIELD ER CAPE LTD., in order to secure the issuance of a Summons and Process of

Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendant, TMT BULK CO., LIMITED, pursuant to Rule

B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of

Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the defendant in

this District.

I have personally checked with the office of the Secretary of State of the State of New

York, using the Secretary of State's Division of Corporations database, and I have determined

Chalos & Co Ref: 2059.030

that, as of July 6, 2009, the defendant is not incorporated pursuant to the laws of New York, and

have not nominated any agent for the service of process within the Southern District of New

York.

I have inquired of Verizon Telephone Company whether the defendant can be located

within this District.  The Verizon Telephone Company has advised me that the defendant does

not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I

have found no separate telephone listings or addresses for the defendant within this District.

I have engaged in a Google search as to whether the defendant can be located within this

District.  The Google search results did not provide any information that defendant is found in

this District.

I am unaware of any general or managing agent(s) within this District for the defendant.

In that I have been able to determine that the defendant has not appointed an agent for

service of process within the Southern District of New York and that I have found no indication

that the defendant can be found within this District for the purposes of Rule B, I have formed a

good faith belief that the defendant does not have sufficient contacts or business activities within

this District and do not have any offices or agents within this District to defeat maritime

attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set

forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendant cannot be found

within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty

and Maritime Claims of the Federal Rules of Civil Procedure.

Chalos & Co Ref: 2059.030

Dated: Oyster Bay, New York
July 6, 2009

CHALOS & CO, P.C.
Attorneys for Plaintiff
TRANSFIELD ER CAPE LTD.

By: _____

George M. Chalos (GC-8693)
123 South Street
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516)750-9051
Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TRANSFIELD ER CAPE LTD.

                         Plaintiff,              09 CV

-v-

                                              **VERIFICATION OF**
                                              **COMPLAINT**

TMT BULK CO., LIMITED

                         Defendant.
------------------------------------------------------------------------x

      Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

      1.      I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

TRANSFIELD ER CAPE LTD., herein;

      2.      I have read the foregoing Verified Complaint and know the contents thereof; and

      3.      I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and

attorneys.

      4.      The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

      I declare under penalty of perjury that the foregoing is true and correct.

Chalos & Co Ref: 2059.030

Dated: Oyster Bay, New York
      July 6, 2009

                      CHALOS & CO, P.C.
                      Attorneys for Plaintiff
                      TRANSFIELD ER CAPE LTD.

By:           _____
                      George M. Chalos (GC-8693)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (516) 750-9051
                      Email: gmc@chaloslaw.com

Chalos & Co Ref: 2059.030